Ronald Abramson
David G. Liston
**LEWIS BAACH pllc**
The Chrysler Building
405 Lexington Avenue
New York, NY 10174
Tel: (212) 826-7001

*Attorneys for Plaintiff*


## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **WAG ACQUISITION, L.L.C.,** | Case No.: 2:14-cv-1661-ES-JAD |
| Plaintiff, | |
| v. | **SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |
| **SOBONITO INVESTMENTS, LTD., COOLVISION LTD., I.M.L. SLU, and DOES 1-20**, | |
| Defendants. | |


Plaintiff WAG ACQUISITION, L.L.C., for its Second Amended Complaint

against Defendants, alleges infringement of United States Patent Nos. 8,122,141,

8,327,011, 8,185,611, and 8,364,839 (the "patents-in-suit").  Plaintiff alleges that

Defendants' Internet delivery of live adult video web cam performances infringes

the patents-in-suit, as more particularly specified herein.  Defendants, operating

from Internet addresses administered by Defendant Coolvision Ltd., commit this infringement from Internet servers situated in the United States, including servers located in this District, in close proximity to this Court.

## THE PARTIES

1.     Plaintiff WAG Acquisition, L.L.C. is a New Jersey limited liability company with its principal place of business at 3 Gold Mine Road, Suite 104, Flanders, New Jersey 07836.

2.     On information and belief, Defendant Sobonito Investments, Ltd. ("Sobonito") is, or at times relevant hereto was, a corporation organized under the laws of Cyprus with its principal place of business in Cyprus and a business address at 41 East 11th Street, New York, New York 10003.

3.     On information and belief, Defendant Coolvision Ltd. ("Coolvision") is a corporation organized under the laws of Israel with its principal place of business at 6 Ha-barzel St., Ramat Hachayal, Tel Aviv, Israel.  On information and belief, Defendant Coolvision does business under a number of trade names, including without limitation ImLive, Pussycash, and WebcamWiz.

4.     On information and belief, Defendant I.M.L. SLU ("IML") is a company organized under the laws of the Principality of Andorra, with its principal place of business at Edifici Burges, Avinguda Sant Antoni 27, La Massana, AD 400, Principat D'Andorra.  "SLU" (Sociedad Limitada Unipersonal) denotes a limited liability company with a single shareholder.  On information and belief, Defendants IML and Coolvision are commonly owned and controlled.  Further on information and belief, Defendant Coolvision also uses "IML," "IML Internet Marketing," "Internet Marketing

Ltd." and similar names to designate some of Defendant Coolvision's own business units in Israel and Cyprus.

5.      On information and belief, Defendants Doe 1 – Doe 20 (collectively "Doe Defendants") are entities whose precise identities are unknown to Plaintiff at this time.  Plaintiff believes that information obtained in discovery will lead to identification of each Doe Defendant's true identity and permit Plaintiff to amend this complaint to state the same.

## JURISDICTION AND VENUE

6.      The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the patent laws of the United States, 35 U.S.C. §§ 1 *et seq*.

7.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)-(c) and 1400(b).

## PLAINTIFF'S BUSINESS AND DEVELOPMENTS

8.      Plaintiff, operating under the trade name SurferNETWORK, is in the business of providing Internet broadcasting services for live and on-demand audio and video program material.  Plaintiff began this business in 1998 and has been one of the leading providers of such services to the terrestrial radio stations and other content providers that comprise its customer base.

9.      Early in developing its business, two of Plaintiff's principals, William A. Grywalski ("Grywalski") and Harry Emerson ("Emerson"), recognized a need that existed in the field of Internet delivery of broadcast media due to the shortcomings

in the then current Internet streaming technologies.  They observed that long startup delays due to "buffering" and frequent program interruptions (sometimes referred to as "jitter") made the experience of trying to listen to or view streaming Internet content frustrating to the end user, and therefore impractical as a content delivery mechanism.  They were interested in making the Internet streaming experience more like radio or television, including the immediacy of having the programming appear to start instantly on demand (*e.g.*, turning on a radio or flipping channels), and continue playing once started without random interruptions.

10.    Plaintiff engaged the assistance of a software design engineer, Harold Price ("Price"), to develop solutions for the shortcomings that Grywalski and Emerson saw in the then current technology, with respect to streaming media playback performance, as well as other technological issues concerning Internet delivery of broadcast media.  Price worked on several aspects of this matter for Plaintiff over the period 1999-2001.

11.    Price was aware of the then current approach to streaming, which attempted to overcome streaming transmission delays and jitter by a variety of techniques, including, for example, establishing a content buffer of 20-seconds or so in duration, on the receiving (user or "client") end of the communication, within the client's media player or media player browser plugin.  After the user selected (*e.g.*, clicked on) a stream, the player would start filling this buffer at the playback rate and then start playing when the buffer was full.  While this method did provide some protection against interruptions for the duration of whatever content was initially buffered, it entailed an undesirable startup delay for "buffering," and

provided no means for graceful recovery once the 20 seconds worth of content in the buffer was consumed.

12.    Price conceived of solutions to these problems.  He built a prototype that implemented one embodiment of those solutions, and he demonstrated that a system according to his new design could overcome the problems put to him by Grywalski and Emerson.

13.    Plaintiff and its predecessors in interest filed a number of U.S. patent applications on these solutions, as enumerated below.  To date, this family of patent applications has resulted in seven issued U.S. patents, including the patents-in-suit. All of these patent applications were assigned to Plaintiff, or to a predecessor-in-interest of Plaintiff and reassigned to Plaintiff.

14.    Plaintiff has been conducting an active, operating business ever since the developments described above, and has actively practiced technology taught in the patents-in-suit, from then to the present.  Plaintiff has developed commercial arrangements under which it streams content for numerous terrestrial radio stations and content providers in New Jersey, regionally, nationally, and internationally.  It also provides a One-Click Royalty Reporter™ for radio stations to report streaming media performance royalty information to SoundExchange (a performing rights organization that collects royalties on behalf of sound recording copyright owners ), among other services.

### DEFENDANTS' BUSINESS ACTIVITIES

15.    Defendants are part of a multinational Internet enterprise based in Israel.  According to the leading Israeli business newspaper *Calcalist*, Defendant

Coolvision is a venture of Muly Litvak, an Israeli Internet entrepreneur and art collector, which operates a network of porn sites from Israel and Cyprus, including the Pussycash and IMLive sites relevant to this action.  On information and belief, Defendant Coolvision is a closely held private corporation, in which Mr. Litvak owns 98.5% of the stock, and which has annual revenues in the hundreds of millions of dollars from the activities accused of infringement herein.

16.    On information and belief, Defendant Coolvision owns more than 400 sexually explicit, pornographic web sites, including its flagship site, imlive.com, driving more than 30 million unique visitors per month.   (References herein to "ImLive" or "imlive.com" include reference to related and affiliated web sites operated by Defendants.)

17.    Defendants' top marketing executive, Shay Efron, who on information and belief was personally recruited for his position by Mr. Litvak, stated in an interview with the adult trade publication *XBiz* in April 2014 that IMLive is "one of the most successful webcam brands in the industry," with 60 million members (registered users), 60,000 performers ("models"), and more than 9,000 "white label" sites (on which the IMLive content is provided under other branding).

### A.   Defendant Coolvision's Worldwide Enterprise

18.    Defendant Coolvision beneficially owns and exercises direct management and control over the worldwide operations of the Defendants in this case, including those essential to conducting Defendants' business in the United States.  The areas in which Defendant Coolvision exercises control over Defendants' worldwide enterprise include without limitation technical design, development,

deployment and operation of the accused infringing servers, and related personnel, recruiting, marketing and management operations, and finance.

19.    Published reports have stated that Defendant Sobonito owns Defendant Coolvision.  However, Coolvision represented in recent copyright litigation in the U.S. (*Ventura Content, Ltd. v. UGC Internet Ventures, Ltd. et al.*, Case No. 1:12-cv-2856, N.D. Ga.) that Defendant Sobonito no longer exists.  U.S. Mail addressed to Defendant Sobonito at 41 East 11th Street, New York, NY 10003 comes back "Return to Sender." Yet the Internet facilities from which imlive.com streams its huge volume of online video are situated at Internet domains and addresses that continue to be registered, to this day, in the name of the allegedly nonexistent Sobonito entity.  Defendant Sobonito is reported by numerous "whois" lookup facilities on the Internet as hosting the services that emanate from these domains and addresses.  On information and belief, these Internet domains and addresses, and the associated server infrastructure in the U.S., are in fact owned, managed, and operated by Defendant Coolvision.

20.    When Defendant Sobonito was sued for copyright infringement in the above-referenced *Ventura* case, it was Coolvision that coordinated the defense, even though Coolvision itself was not named in that action.  The affidavits submitted in Sobonito's defense came directly from Coolvision, and from officials of a British Virgin Islands affiliate of Coolvision named IML Holdings, Ltd. (which, on information and belief, is an affiliate of Defendant IML).  IML Holdings, Ltd.'s subsidiary (UGC Internet Ventures, Ltd., another BVI company) and Defendant Sobonito were commonly represented in the *Ventura* action by the same law firm

that is representing Defendants herein.  The affiants in the *Ventura* case, seeking to have the case transferred from the Northern District of Georgia, contended that the defendants' witnesses and documents were primarily located in Israel and Cyprus.  At the same time, however, these affiants also authoritatively documented the close intercompany relations in this group, and the ultimate control exercised over the group by Coolvision.

21.    Among the submissions in the *Ventura* case was an affidavit of Noam Fogel, the Chief Technical Officer for Coolvision, attesting to Coolvision's responsibility for creating, administering and monitoring Coolvision's adult web sites (including those involved in the U.S. action), and for site content, marketing and promotion.  Coolvision's responsibility for these several aspects of Defendants' activities, both as explained in that affidavit and independently documented from numerous sources, is detailed in the allegations below.

22.    The following allegations are provided to substantiate that Defendant Coolvision conducts a substantial Internet business in the United States by proxy, using nonexistent and/or sham entities to hold Internet addresses and domains in the U.S., directly designing, operating and managing those services on servers in the United States, and providing, through itself and its closely-held affiliate, IML, the substantial marketing, recruitment, management and financial support for this business, from afar.

### B.  Defendants' Internet Operations

23.    Adult streaming media is an extremely high volume business, which is well known as consuming a high percentage of the total bandwidth available on the

Internet.  Operating in this market requires sophisticated technology and complex infrastructure.  While the operational demands of the adult streaming business entail high infrastructure cost, the market for Defendants' services is also very large, making the business extremely lucrative.

24.    Success in Defendants' business depends on the technological capability to deliver streaming media content in a responsive, smooth, and scalable manner, as made possible by Plaintiff's patents.  Defendants derive great value as a result of operating under Plaintiff's patented technology, for which they have not compensated Plaintiff.

25.    Defendants' services on the Internet are provided by computers, referred to as "servers."  Each such server is reachable over the Internet by its "address" on the Internet, referred to as its Internet Protocol (IP) address.  Every device publicly accessible on the Internet has its own globally unique (*i.e.*, non-duplicated) IP address.

26.    IP addresses are represented as a four-part string of numbers, such as 123.45.678.9, resembling a telephone number.  To make the Internet addressing system more user-friendly, the numeric IP addresses are often given names ("domain names"), such as google.com or ebay.com, so that users can reach the desired services by a memorable name, rather than a number (*e.g.*, www.google.com as opposed to 74.125.228.80).  An Internet mechanism called the Domain Name Service (DNS) maps the domain names to the numeric IP addresses of the machines that serve content for the domains, so that the requests directed to domain names (*e.g.*, google.com) will reach the proper numerical IP addresses (in this example,

74.125.228.80), and thereby the proper servers.  "Subdomains" may also be

assigned within individual domains, for example, **www**.google.com,

**mail**.google.com, **voice**.google.com, etc.  Each subdomain represents a different

server reachable through the main domain (google.com), but mapped to a separate

IP address.  (That is, the subdomain mail.google.com (aka "gmail") maps to

74.125.228.246, as opposed to the 74.125.228.80 address for main google.com

search engine site.)

27.    Internet domain names and IP addresses are given out by a process that

involves registration with accredited registrars.

28.    A given IP address will be assigned to a registrant at a listed business

address, but the use of the IP address is not tied to the location of the registrant's

business address.  The registrant can locate its servers anywhere it wishes,

geographically, and use the IP addresses it owns (or rents) to identify those servers

on the Internet.  The physical location of the server will bear upon the speed at

which content can be delivered to users.  Generally, the closer the server is to the

user, the better the delivery will be.  Multiple servers may be deployed in a manner

such that individual users will be directed to different servers based on their

proximity to the respective servers.

29.    Since large operations often use many servers, IP addresses are

generally given out by the responsible authorities in "blocks" of addresses of various

sizes.  Internet names and numbers are valuable commodities (akin to real estate),

and their ownership is maintained through a group of the aforementioned

governmental and private registrars.

30.   The web site www.imlive.com serves content for the primary web page at the Defendants' domain imlive.com.  However, when a user accesses an individual performer through imlive.com, the streaming video for the performance is served from a *separate* domain named "globalmailer.com."

31.   Currently, the domain registration details for globalmailer.com are deliberately hidden behind the proxy service run by Moniker Online Services LLC.  Historical registration records, however, are available and show that the globalmailer.com domain was created in 1999 and as of January 2009 was registered to Defendant Sobonito.

32.   Defendants' domain "globalmailer.com" is associated (by the DNS service) with the Internet IP address 66.6.18.71.  This IP address, assigned by the American Registry for Internet Numbers (ARIN), is currently, as of the date of this Second Amended Complaint, held in the name of Sobonito.  However, the "Point of Contact" data for this address as listed with ARIN points to an email registered to Defendant Coolvision at its Tel Aviv address.

33.   The globalmailer.com domain was formerly used to send mass electronic mail transmissions to promote Defendants' pornographic web sites including pussycash.com and imlive.com.  The U.S. Federal Trade Commission sued Defendant Sobonito in 2005 for deceptive email "spam" practices in the U.S. (Case No. 1:05-cv-00580, N.D. Ill.).  Sobonito, represented by the same law firm that represents it in this action (as well as in the above-mentioned copyright action), entered into a consent decree with the FTC at that time, recognizing jurisdiction and

venue in the U.S. district court, and agreeing to an injunction against violations of the U.S. CAN-SPAM Act, 15 U.S.C. § 7704 *et seq*.

34.    Currently, Defendants use the globalmailer.com domain to host the infringing streaming servers described herein.  Users requesting live performance streams on Defendants' imlive.com web site are automatically directed by Defendants' web sites to various machine hosts at subdomains of globalmailer.com, each associated with its own IP address.  Because different viewing platforms (*e.g.*, mobile phone, tablet, computer, etc.) will be optimized for different (and sometimes incompatible) protocols, the server responding to any given request for a live performance will vary, depending on Defendants' identification of the computer or mobile device used by the user to access the stream.  In general, Defendants' servers will redirect the user to a server best adapted to serve content to the user's device.

35.    The subdomains under globalmailer.com include subdomains such as fly1.globalmailer.com, fly103.globalmailer.com, and the like, which are configured to serve different types of user devices.  The servers at these subdomains operate from distinct blocks of Internet IP addresses, on equipment that Defendants deploy and operate at data centers that the Defendants select.  The address blocks used by the Defendants for their aforementioned "fly1" and "fly103" subdomains include address blocks at 66.6.16.0/20 and 54.236.0.0/15.

36.    Defendants' 66.6.16.0/20 IP address block, used by streaming servers including the server at fly1.globalmailer.com, is currently registered in the name of Defendant Sobonito.  The lead "Point of Contact" email for this address block is the same above-noted email address for Defendant Coolvision that was used as the

administrative contact for globalmailer.com.   At least one server at this address

block, configured to deliver content to mobile devices in a manner that infringes

Plaintiff's patents (as described in further detail at, *inter alia*, Par. 65 below), is

deployed at a data center in or around Newark, New Jersey, in extremely close

proximity to this Court, and, on information and belief, is operated by Defendant

Coolvision.

 37. Defendants' 54.236.0.0/15 address block is used by other servers in the

globalmailer.com domain, including the server at fly103.globalmailer.com, to deliver

streaming content to desktop recipients, also in a manner that infringes Plaintiff's

patents (as described in further detail at, *inter alia*, Par. 125 below).  The

54.236.0.0/15 address block is for EC2 ("Elastic Compute") virtual machine services

with Amazon.com in Amazon's US-East region, which is provided at a facility located

in Ashburn, Virginia (in Northern Virginia).  Amazon's EC2 services provide high-

volume server capacity on demand to subscribing customers, allowing the

customers to configure and administer their own Internet services through

Amazon's facilities.  On information and belief, Defendant Coolvision operates and

administers the infringing EC2 servers in the Amazon 54.236.0.0/15 address block.

 38. On information and belief, Defendants' worldwide technical

development, including web site design, copy, user experience (UX), and user

interface (UI) is managed and operated by Defendant Coolvision in Israel, utilizing

the majority of Coolvision's 140 employees at its headquarters location in Tel Aviv.

The technical developers and managers who work or recently worked for Coolvision

in Israel regularly post their activities and credentials on the professional

networking site LinkedIn.  Such LinkedIn profiles for numerous high-level

Coolvision employees, based primarily in Tel Aviv, Israel and Cyprus, document

their responsibility for the design and implementation of both the desktop and

mobile web site designs for IMLive and related Coolvision web sites – the sites

Defendants operate from New Jersey and Northern Virginia, which are accused of

infringement herein.  On information and belief, these Coolvision employees

designed, implemented, and currently control and operate the highly complex set of

servers, infrastructure, software, and protocols utilized to provide the streaming

services alleged herein to infringe Plaintiff's patents.

### C.  Defendants' Marketing  Operations

39.    Defendants aggressively market their live webcam services to a

worldwide audience, including, on information and belief, a substantial volume of

users in this District, from which defendants derive substantial revenues.

40.    On information and belief, Defendants' worldwide marketing activities

are operated and controlled by Defendant Coolvision, and led by Mr. Efron from

Cyprus, with employees in Israel and Cyprus.  The employees responsible for the

worldwide marketing of Defendants' web sites hold themselves (*e.g.*, on LinkedIn)

as being employed by "Coolvision" and/or "IML Internet Marketing," and/or

"Sobonito Inv." and also show movement from one such unit to another.

41.    Among their marketing activities, Defendants provide an "Affiliate"

program, under which Defendants' imlive.com and other webcam sites can be

adapted ("white labeled") for other Internet service providers on a revenue splitting

basis, or simply linked to, on a similar basis (*i.e.*, the "9,000" white-labeled sites

referred to by Mr. Efron in his interview).  The "Affiliate Program" is a crucial part of the business of operating Defendants' business.  Through such affiliation, providers of other high volume pornography sites (frequently "Tube" (Youtube-style) sites offering short, low-quality, prerecorded clips on a free basis) provide a paid, revenue-generating webcam adjunct service under the Tube site provider's own branding.  The live webcam Affiliate site will appear to the user of the Tube site as a click-through site, or in a window that pops over the Tube site.  Though branded and decorated to look like the Tube site, the Affiliate site is actually served by Defendants herein.  The Affiliate site provider and the other Defendant(s) split the revenue resulting from the Affiliate site activity, in accordance with the terms of Defendants' Affiliate program.  In return, Defendants get the benefit of the expanded market "footprint" provided by the affiliated web sites, as well as the remainder of the revenue.

### D.  Defendants' Workforce Recruitment

42.    Defendants claim to have 60,000 performers retained for their business. Having such a large and steady supply of labor, to perform sex acts on camera, is critical to Defendants' business, worldwide and in the United States.   On information and belief, it is extremely important to Defendants, to maintain competitive parity in their business, to have sufficient depth in each category of interest to users, and a sufficient number of performers in each such category available and live on-line at any given time.  Having this variety and depth requires a reliable, high-volume, wholesale supply of performers.  On information and belief,

the business function of recruiting this necessary labor force for Defendants' U.S. and worldwide customers is carried out by Defendant Coolvision.

43.    Defendant IML nominally serves as Defendants' global workforce supplier.  However, on information and belief, Defendant IML, which is incorporated in Andorra (a tiny principality, known as an international tax haven, located in a mountainous area on the border between France and Spain), has no substantial assets or organizational substance, and is beneficially owned and operated by Defendant Coolvision.  On information and belief, the business operations conducted by Defendant IML are actually conducted from Coolvision's facilities in Israel and Cyprus using common employees and management, who also identify themselves as working for Coolvision.

44.    Defendants' imlive.com web site directly engages individual web cam performers who sign up online, under arrangements including without limitation contracts in the name of Defendant IML.   Among the tens of thousands of individuals retained by Defendants as performers are numerous New Jersey residents, who perform online over Defendants' infringing services, from New Jersey, through server facilities provided by Defendants.

45.    While important to Defendants, such on-line recruiting is by no means sufficient to meet Defendants' needs for labor.  Therefore, in addition, Coolvision employees and managers, who simultaneously hold positions with IML, are tasked by Coolvision with large-scale recruiting efforts throughout the world.  For example, according to the LinkedIn profile of a former senior Coolvision employee, such responsibilities included, *inter alia*, "develop[ing] partnerships" with "web content

suppliers . . . mainly [in] Eastern Europe and CIS countries." On information and belief, the majority of Defendants' workforce supply results from such recruiting.

46. On information and belief, the "web content suppliers" referred to by the Coolvision employees are well known recruitment agencies located in Eastern Europe, the former Soviet states, and Asia, which on information and belief, are widely used throughout the adult web cam industry as a wholesale source of performers. In order to run Defendants' business and address the lucrative U.S. market, it is essential to have such sources of labor, and Coolvision supplies this essential element, which is necessary to conduct the high volume of activities in the United States resulting in the infringement alleged herein.

### E. Defendants' Account Management and Finance Operations

47. On information and belief, Defendants' worldwide account management and financial functions are operated by Coolvision from Cyprus, historically a tax and bank secrecy haven. Defendant Sobonito was incorporated by Defendants in Cyprus, but on information and belief the individuals in Cyprus now performing account management and financial functions for Defendants hold themselves out as Coolvision employees.

48. On the basis of the foregoing, Plaintiff alleges that Defendant Coolvision is the real party in interest in operational control of all U.S. activities of the Defendants including the matters complained of herein.

49. On information and belief, Defendant Coolvision itself or in concert with other Defendants uses Defendants Sobonito and IML as sham entities, agents, and/or alter egos to register, host, recruit and retain performers, and/or operate the

Internet domains and IP address blocks used to operate the web servers that provide the services accused of infringement herein, but in reality these activities are all being directed and carried out by and on behalf of Defendant Coolvision.

50.    On information and belief, and without limiting the foregoing, Defendants Coolvision, Sobonito, IML, and the Doe Defendants, operating as alleged herein, perform in concert with, and/or exercise control over, each other, in a manner that makes them jointly and severally responsible with respect to the conduct complained of herein, including without limitation the conduct that renders them subject to personal jurisdiction and the conduct that makes them liable to Plaintiff for damages.

### F.   Defendant Coolvision's Web Sites

51.    Defendants' business crucially relies on streaming technology from end-to-end.  Defendants  take live feeds from their performers' individual webcams, over the Internet, for redistribution through Defendants' servers.  Users can selectively view any of the individual streams through an interface that also provides an interactive "chat" window.  Through the chat interface, a user can exchange short text messages ("chat") with other users and models, and request performances and "private sessions."  The user interface provided on Defendants' web sites provide mechanisms to buy online services and pay and tip performers with monies charged to users' credit cards.

52.    Defendants' servers, operated in the United States, under Defendant Coolvision's ownership and control, are configured to receive live streams from user and model webcams, and to stream Defendants' live webcam performances and

other video streams over a variety of delivery technologies to diverse user equipment, including, *inter alia*, desktop computers and mobile devices (collectively referred to herein as "Players").  Defendants do this through servers such as those described at Pars. 30 - 37 above.  Such streaming (and the server from which the stream is served) varies, depending on the web site from which the stream was requested and the type of Player to which the stream is being delivered.  However, on information and belief each of the various modes of streaming delivery employed by Defendants' servers infringe one or more of Plaintiff's patents, as hereinafter alleged.

## THE PATENTS-IN-SUIT

53.   The patents-in-suit comprise the following United States Patents, which were duly and legally issued on the dates indicated:

| Pat. No. | Issued | Title | Reference |
|----------|--------|-------|-----------|
| 8,122,141 | Feb. 21, 2012 | STREAMING MEDIA BUFFERING SYSTEM | '141 patent |
| 8,327,011 | Dec. 4, 2012 | STREAMING MEDIA BUFFERING SYSTEM | '011 patent |
| 8,185,611 | May 22, 2012 | STREAMING MEDIA DELIVERY SYSTEM | '611 patent |
| 8,364,839 | Jan. 29, 2013 | STREAMING MEDIA DELIVERY SYSTEM | '839 patent |

54.   The patents-in-suit were developed in the course of Plaintiff's business and were assigned by Price (the inventor) to Plaintiff's predecessors in that business, which reassigned them to Plaintiff, the current operator of the business.

Plaintiff owns all rights to recover for past and ongoing infringement of the patents-in-suit.

*Notice of the Patents-In-Suit and Infringement Thereof*

55.    Pursuant to 35 U.S.C. § 287(a), Defendants had notice of the '141 and '011 patents, and of their manner of infringement thereof, by reason of the filing of this action on March 14, 2014.

56.    The First Amended Complaint added the '611 and '839 patents to this action.  Defendants again had notice of the patents-in-suit (in this case of all four patents-in-suit), and of the manner in which Defendants are infringing those patents, upon filing of the First Amended Complaint herein on April 24, 2014.

57.    Defendants further had notice of all of the patents-in-suit, and of their manner of infringement thereof, upon service of process, beginning with service of process on Defendant Coolvision (which included copies of the original and First Amended Complaints) on or about May 12, 2014.  Plaintiff alleges that, to the extent Defendant Coolvision may have been the first party to have received such notice, notice to Defendant Coolvision was sufficient to put all of the Defendants on notice of the patents-in-suit and of the manner in which Defendants are infringing those patents.

58.    In addition, Defendants were given further notice of all of Plaintiffs' streaming media patents, including all four of the patents-in-suit, and their infringement thereof, by a letter (the "Demand Letter") sent to each defendant and to the law firm representing them herein (at the law firm's New York address) on March 14, 2014.  On information and belief, the Demand letter was received by

Defendants' law firm shortly thereafter, within the normal 2-3 day period for delivery of mail within New York City, and was received shortly thereafter in due course for international mail delivery by Defendants Coolvision and IML.  Plaintiff alleges that receipt by said law firm and/or any of the Defendants of the Demand letter was sufficient to put all of the Defendants on notice of the patents-in-suit and of the manner in which Defendants are infringing those patents.

59.   Defendants again had notice of the patents-in-suit and of the manner in which Defendants are infringing those patents upon filing of this Second Amended Complaint.

60.   The earliest of the dates alleged in Pars. 55-59 by which each Defendant herein had notice of the patents-in-suit and of its infringement thereof is herein referred to (separately as to each Defendant, to the extent, if any, that different Defendants may have received such notice on different dates) as the "Notice Date."

## COUNT I: DIRECT INFRINGEMENT OF THE '141 PATENT

61.   Plaintiff repeats and realleges the allegations of paragraphs 1-60 above as if fully set forth at length herein.

62.   35 U.S.C. § 271(a) provides in pertinent part as follows:

> "(a) . . . whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent."

63.   Defendants, acting in respective roles as herein alleged, have infringed and are still infringing the '141 patent by making, selling, offering to sell, performing, and using apparatus and methods that embody one or more claims

thereof, by conduct including without limitation the acts alleged in the paragraphs that follow.

64.    Defendants provide their services through a large Internet server infrastructure, a material portion of which is located in the United States. Defendants' direct infringement results from the operation of the servers that serve the content for Defendants' accused infringing web sites.  Defendants' individual responsibility for the operation of said servers is as follows.  Defendant Sobonito nominally owns the Internet addresses and domains from which the infringing services are provided, and is widely regarded as hosting these services.  Defendant Coolvision is expressly designated as having administrative responsibility for these domains, and as alleged above, on information and belief is responsible for designing, implementing, operating, and managing the software and servers that provide the infringing services.  Further, as alleged above, Defendants Coolvision, IML, and one or more Doe Defendants are responsible for providing services and support essential to run the business that sustains such servers, including without limitation technical, marketing, recruiting, administrative, accounting, and financial services, all for the ultimate financial benefit of defendant Coolvision and its owners.

65.    Defendants' servers include servers that use the same "divide and conquer" approach described in the '141 patent to deliver streaming data. Defendants' servers assign serial identifiers to sequential media data elements comprising the stream.  The servers receive, from users, requests for these elements.  The requests identify the requested data elements by the serial identifiers.  The servers then serve the elements in response to the requests.  This

mechanism provides for a fast start of streaming playback, and at the same time allows the Player to moderate media flow by "pulling" data as needed, based on its own rate of consuming content.  Defendants' servers incorporate each and every element of claims 10-17 of the '141 patent and are therefore infringing.  By operating such servers, Defendants directly infringe claims 10-17 of the '141 patent.

66.    Claims 19-23 of the '141 patent concern computer software that runs servers such as Defendants' servers described in Par. 65.  The software that operates defendants' servers meets each and every limitation set forth in claims 19-23 of the '141 patent and is therefore infringing.  By operating said servers, and thereby using such computer programs, Defendants directly infringe claims 19-23 of the '141 patent.

67.    Claims 1-8 and 28 of the '141 patent concern providing a server essentially as described in Par. 65, as well as software ("Player Software") to run the Players.  The Player Software causes Players to request the data elements from the servers, by their identifiers, and to maintain a record of the data elements already received.  Defendants provide servers that meet the first set of requirements recited in these claims.  Through such servers, Defendants direct and control users' Players (as further alleged below) to provide Player Software in accordance with the second set of requirements recited in these claims.  By performing these steps (which together comprise all of the steps of the claims), Defendants thereby directly infringe claims 1-8 and 28 of the '141 patent.

68.    Defendants, through their servers, direct and control users' Players as alleged in Par. 67 by, including without limitation, the following acts.  Defendants'

servers read encoded information in network packets received from Players and identify the type of Player that sent the packet. When Defendants identify a Player as compatible with Defendants' video stream, Defendants' servers send such Players electronic instructions that cause the Players, without any user intervention, to load and execute the Player Software (thereby putting the Players and Player Software into service), so that the Player may then request and receive the serialized streaming transmissions from Defendants' servers. Defendants' servers also send electronic data to the Players containing the serial identifiers used by the Players to request streaming media elements, thereby further controlling the operation of the Players.

69.    Furthermore, some of Defendants servers take an alternate approach. Rather than invoking and operating software built into users' Players, these servers actually transmit to the Players a separate increment of software that provides the Player Software functionality. This software increment is referred to herein as the "ImLive Downloaded Software.") Instructions from Defendants' server then launch and operate this software. The ImLive Downloaded Software is programmed to cause the Player to maintain a record of the identifier of the last data element that has been received, and to transmit requests to the server to send the next sequential data elements, further reflecting, in combination with Defendants' server-side activities alleged in Par. 65 above, direct infringement of claims 1-8 and 28 of the '141 patent.

70.    In addition, and in the alternative, and without limiting any of the foregoing allegations, Defendants also directly infringe claims 1-8 and 28 of the '141

patent under 35 U.S.C. § 271(a) by Defendants' acts combined with those of their users, with knowledge that each step of said patented methods will be performed through the combined action of Defendants and the user.

71.   Claims 24-27 of the '141 patent concern Player Software.  Defendants directly infringe claims 24-27 of the '141 patent by using the Player Software claimed in said claims, which Plaintiff alleges meets each and every limitation set forth in said claims and is infringing, and directing and controlling users' use of such infringing Player Software.

72.   Defendants use infringing Player Software and thereby directly infringe claims 24-27 of the '141 patent by putting the Player Software into service as alleged in Par. 68 and making beneficial use of the Player Software by using the Player Software as part of a delivery mechanism whereby Defendants deliver their live streaming video content to end users through the users' Players.

73.   Defendants' embodiments that provide IMLive Downloaded Software also directly infringe claims 24-27 of the '141 patent by making Player Software on the user's Player.  Defendants make Player Software by transmitting and causing to be recorded in nontransitory storage media on the user's Player software having all of the functionality recited in claims 24-27.

74.   In the alternative, and without limiting the foregoing, Defendants also directly infringe claims 24-27 of the '141 patent by directing and controlling users' Players to use infringing Player Software in the manner alleged in Par. 68.

75.   Plaintiff is entitled to recover all past, present, and ongoing damages it has sustained as a result of Defendants' direct infringement of the '141 patent.

76.    Pursuant to 35 U.S.C. § 284, Plaintiff is entitled to not less than a reasonable royalty for the use made by the Defendants under the '141 patent, in an amount subject to proof at trial, together with interest and costs as fixed by the Court.

## COUNT II: INDUCED INFRINGEMENT OF THE '141 PATENT

77.    Plaintiff repeats and realleges the allegations of paragraphs 1-76 above as if fully set forth at length herein.

78.    35 U.S.C. § 271(b) provides:

> "Whoever actively induces infringement of a patent shall be liable as an infringer."

79.    In addition and in the alternative to Plaintiff's allegations of direct infringement of claims 24-27 of the '141 patent, and without limiting anything alleged in connection therewith, Plaintiff alleges that Defendants, by conduct more particularly alleged in the paragraphs that follow, also actively induce infringement, by users, of claims 24-27 of the '141 patent.

80.     The Player Software meets each and every limitation of claims 24-27 of the '141 patent, and is therefore infringing.  When users use the infringing Player Software, they directly infringe claims 24-27 of the '141 patent.

81.    Defendants actively induce such direct infringement by users in a number of ways, including without limitation, the following.  Defendants, through their servers, as aforesaid, provide to users video streams that are especially adapted to be viewed on Players running compatible Player Software, which streams are only viewable on Players so configured.  Defendants' servers provide

such streams when they identify that the user is using compatible Player Software. These streams provide a superior viewing experience that further induces the user to use Players running such Player Software when they use Defendants' service. Defendants' servers send electronic instructions causing the Players to load and execute compatible Player Software, and electronic data containing the serial identifiers for the Players to use to request sequential media data elements.

82.   Defendants further induce such infringement by recommending that users use Players adapted to interoperate with their servers and infringe said claims, and facilitating the users' use of such Players by providing directions and links for such use and sites specifically configured for such Players.

83.   Defendants further induce such infringement by users by providing the IMLive Downloaded Software.

84.   The users of such Players are thereby induced by Defendants to directly infringe claims 24-27 of the '141 patent (*e.g.*, by using Player Software within the scope of said claims, whereby said users directly infringe such claims as aforesaid).

85.   As a consequence of the foregoing, since at least the Notice Date, Defendants have engaged in such inducement  with knowledge of the '141 patent; with knowledge that users' Players use Player Software meeting the limitations of claims 24-27 of the '141 patent; with knowledge that the users directly infringe claims 24-27 of the '141 patent when they use Player Software; with knowledge of how Defendants' conduct actively induces users to infringe the '141 patent by using Player Software; and with the specific intent to cause such infringement, knowing that the users' acts constitute direct infringement of the '141 patent.

86.    Plaintiff is entitled to recover all damages it has sustained since at least as early as the Notice Date, and all such ongoing damage, as a result of Defendants' induced infringement of the '141 patent.

87.    Pursuant to 35 U.S.C. § 284, Plaintiff is entitled to not less than a reasonable royalty for Defendants' induced infringement of the '141 patent, in an amount subject to proof at trial, together with interest and costs as fixed by the Court.

## COUNT III: CONTRIBUTORY INFRINGEMENT OF THE '141 PATENT

88.    Plaintiff repeats and realleges the allegations of paragraphs 1-87 above as if fully set forth at length herein.

89.    35 U.S.C. § 271(c) provides:

"Whoever offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer."

90.    Since at least the Notice Date, Defendants did have and are deemed to have had notice of the '141 patent.

91.    Since at least said date, Defendants, through their servers, as aforesaid, have offered to sell or sold within the United States or imported into the United States the ImLive Downloaded Software, knowing the same to be especially made or

especially adapted for use in an infringement of the '141 patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use.

92.    The ImLive Downloaded Software constitutes a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, with respect to at least claims 24-27 of the '141 patent.

93.    The addition of the ImLive Downloaded Software provided by Defendants to the Players possessed by users transforms the Players in said users' hands into infringing articles (without limiting the circumstances in which such Players may have otherwise already been infringing), thereby making said users direct infringers of the '141 patent.  By providing users with the ImLive Downloaded Software, Defendants contribute to said users' infringement of the '141 patent.

94.    By reason of the foregoing, in addition and in the alternative to Plaintiff's allegations under Counts I and II, and without limiting anything alleged therein, Defendants are liable as contributory infringers with respect to at least claims 24-27 of the '141 patent.

95.    Plaintiff is entitled to recover all damages it has sustained since at least the Notice Date, and all such ongoing damage, as a result of Defendants' contributory infringement of the '141 patent.

96.    Pursuant to 35 U.S.C. § 284, Plaintiff is entitled to not less than a reasonable royalty for Defendants' contributory infringement of the '141 patent, in an amount subject to proof at trial, together with interest and costs as fixed by the Court.

## COUNT IV: DIRECT INFRINGEMENT OF THE '011 PATENT

97.    Plaintiff repeats and realleges the allegations of paragraphs 1-96 above as if fully set forth at length herein.

98.    Defendants, acting in the respective roles hereinabove alleged, have infringed and are still infringing the '011 patent by using Players that embody one or more claims thereof.

99.    Defendants infringe such claims directly, by using the Players claimed in said claims, which Plaintiff alleges meets each and every limitation set forth in said claims and are infringing, and by directing and controlling users' use of such infringing Players.

100.  Defendants use infringing Players and thereby directly infringe claims 1-4 of the '011 patent by putting the Players into service as alleged in Par. 68 and making beneficial use of the Players by making the Players part of a delivery mechanism whereby Defendants deliver their live streaming video content to end users.

101.  Defendants direct and control users' Players by, including without limitation, the following.  Defendants' servers read encoded information in network packets received from Players and identify the type of Player that sent the packet. When Defendants identify a Player as compatible with Defendants' video stream, Defendants' servers send such Players electronic instructions that cause the Players, without any user intervention, to load and execute the Player Software (thereby putting the Players and the Player Software into service), so that the Player may then request and receive the serialized streaming transmissions from Defendants'

servers.  Defendants' servers also send electronic data to the Players containing the serial identifiers used by the Players to request streaming media elements, thereby further controlling the operation of the Players.

102.  Defendants also make infringing Players within the scope of claims 1-4 of the '011 patent and thereby directly infringe said claims by transmitting IMLive Downloaded Software to users' Players so as to transform them into infringing Players.

103.  Plaintiff is entitled to recover all past, present, and ongoing damages it has sustained as a result of Defendants' direct infringement of the '011 patent.

104.  Pursuant to 35 U.S.C. § 284, Plaintiff is entitled to not less than a reasonable royalty for the use made by the Defendants under the '011 patent, in an amount subject to proof at trial, together with interest and costs as fixed by the Court.

## COUNT V: INDUCED INFRINGEMENT OF THE '011 PATENT

105.  Plaintiff repeats and realleges the allegations of paragraphs 1-104 above as if fully set forth at length herein.

106.  In addition and in the alternative to Plaintiff's allegations of direct infringement of claims 1-4 of the '011 patent, and without limiting anything alleged in connection therewith, Plaintiff alleges that Defendants, by conduct more particularly alleged in the paragraphs that follow, also actively induce infringement, by users, of claims 1-4 of the '011 patent.

107.   The users' Players meet each and every limitation of claims 1-4 of the '011 patent, and are therefore infringing.  When users use such infringing Players, they directly infringe claims 1-4 of the '011 patent.

108.   Defendants actively induce such direct infringement by users in a number of ways, including without limitation the following.  Defendants, through their servers as aforesaid, provide to users video streams that are especially adapted to be viewed on Players running compatible Player Software, and only viewable on Players so configured.  Defendants' servers provide such streams when they identify that the user is using a compatible Player.  These streams provide a superior user experience that further induces the user to use such Players when they use Defendants' service.  Defendants' servers send electronic instructions causing the Players to load and execute compatible Player Software and electronic data containing the serial identifiers for the Players to use to request sequential media data elements.

109.  Defendants further induce such infringement by recommending that users use Players adapted to interoperate with their servers and infringe said claims, and facilitating the users' use of such Players by providing directions and links for such use and sites specifically configured for such Players.

110.  Defendants further induce such infringement by users by providing the IMLive Downloaded Software.

111.  The users of such Players are thereby induced by Defendants to directly infringe claims 1-4 of the '011 patent (*e.g.*, by using Players within the scope of said claims, whereby said users directly infringe such claims).

112.  As a consequence of the foregoing, since at least the Notice Date, Defendants have engaged in such inducement  with knowledge of the '011 patent; with knowledge that users' Players use Player Software meeting the limitations of claims 1-4 of the '011 patent; with knowledge that the users directly infringe claims 1-4 of the '011 patent when they use Player Software; with knowledge of how Defendants' conduct actively induces users to infringe the '011 patent by using Player Software; and with the specific intent to cause such infringement, knowing that the users' acts constitute direct infringement of the '011 patent.

113.  Pursuant to 35 U.S.C. § 284, Plaintiff is entitled to not less than a reasonable royalty for the use made by the Defendants under the '011 patent, in an amount subject to proof at trial, together with interest and costs as fixed by the Court.

114.  Plaintiff is entitled to recover all past damages from such infringement to the extent such infringement constituted direct infringement; all damages from at least the Notice Date for such infringement that constituted indirect infringement; and all continuing damages so sustained by Plaintiff as a result of any such infringement.

## COUNT VII: CONTRIBUTORY INFRINGEMENT OF THE '011 PATENT

115.  Plaintiff repeats and realleges the allegations of paragraphs 1-114 above as if fully set forth at length herein.

116.  Since at least the Notice Date, Defendants did have and are deemed to have had notice of the '011 patent.

117.  Since at least said date, Defendants, through their servers, as aforesaid, have offered to sell or sold within the United States or imported into the United States the ImLive Downloaded Software, knowing the same to be especially made or especially adapted for use in an infringement of the '011 patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use.

118.  The ImLive Downloaded Software constitutes a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, with respect to at least claims 1-4 of the '011 patent.

119.  The addition of the ImLive Downloaded Software provided by Defendants to the Players possessed by users transforms the Players in said users' hands into infringing articles (without limiting the circumstances in which such Players may have otherwise already been infringing), thereby making said users direct infringers of the '011 patent.  By providing users with the ImLive Downloaded Software, Defendants contribute to said users' infringement of the '011 patent.

120.  By reason of the foregoing, in addition and in the alternative to Plaintiff's allegations under Counts IV and V, and without limiting anything alleged therein, Defendants are liable as contributory infringers with respect to at least claims 1-4 of the '011 patent.

121.  Plaintiff is entitled to recover all damages it has sustained since at least as early as the Notice Date, and all such ongoing damage, as a result of Defendants' contributory infringement of the '011 patent.

122.  Pursuant to 35 U.S.C. § 284, Plaintiff is entitled to not less than a reasonable royalty for Defendants' contributory infringement of the '011 patent, in an amount subject to proof at trial, together with interest and costs as fixed by the Court.

## COUNT VII: DIRECT INFRINGEMENT OF THE '611 PATENT

123.  Plaintiff repeats and realleges the allegations of paragraphs 1-122 above as if fully set forth at length herein.

124.  Defendants, through their servers as aforesaid, have infringed and are still infringing the '611 patent by making, selling, offering to sell, performing, and using apparatus and methods that embody one or more claims thereof.

125.  Among the servers that Defendants operate are servers that employ the buffering (temporary storage) scheme claimed in the '611 patent, to control transmission of streaming media to achieve fast startup of the playback and rapid recovery from interruptions.  Those servers send initial streaming media elements to Players at an initial sending rate more rapid than the playback rate of the media stream to fill a buffer in the user's Player, and thereafter send further streaming media data elements to the Player at about the playback rate.  Defendants' servers perform these functions in a manner that meets each and every limitation of one or more claims of the '611 patent, thereby directly infringing the '611 patent.

126.  Pursuant to 35 U.S.C. § 284, Plaintiff is entitled to not less than a reasonable royalty for the use made by the Defendants under the '611 patent, in an amount subject to proof at trial, together with interest and costs as fixed by the Court.

127.  Plaintiff is entitled to recover all past and continuing damages so sustained by Plaintiff as a result of such infringement.

## COUNT VIII: DIRECT INFRINGEMENT OF THE '839 PATENT

128.  Plaintiff repeats and realleges the allegations of paragraphs 1-127 above as if fully set forth at length herein.

129.  Defendants, through their servers as aforesaid, have infringed and are still infringing the '839 patent by making, selling, offering to sell, performing, and using apparatus and methods that embody one or more claims thereof.

130.  Among the servers that Defendants operate are servers that employ a buffering scheme as claimed in the '839 patent, to control transmission of streaming media to achieve fast startup of the playback and rapid recovery from interruptions. Those servers load a buffer on the server with streaming media data elements, send an initial amount of streaming media elements to Players at an initial sending rate more rapid than the playback rate, and thereafter send further streaming media data elements to the Player at about the playback rate.  Defendants' servers perform these functions in a manner that meets each and every limitation of one or more claims of the '839 patent, thereby directly infringing the '839 patent.

131.  Pursuant to 35 U.S.C. § 284, Plaintiff is entitled to not less than a reasonable royalty for the use made by the Defendants under the '839 patent, in an amount subject to proof at trial, together with interest and costs as fixed by the Court.

132.  Plaintiff is entitled to recover all past and continuing damages so sustained by Plaintiff as a result of such infringement.

## COUNT IX: WILLFUL INFRINGEMENT

133.  Plaintiff repeats and realleges the allegations of paragraphs 1-132 above as if fully set forth at length herein.

134.  35 U.S.C. § 284 provides in pertinent part as follows:

> "When the damages are not found by a jury, the court shall assess them. In either event the court may increase the damages up to three times the amount found or assessed."

135.  35 U.S.C. § 285 provides as follows:

> "The court in exceptional cases may award reasonable attorney fees to the prevailing party."

136.  Defendants had notice of the patents-in-suit and of their manner of infringement thereof since at least the Notice Date (as such date may be determined with respect to each Defendant under the allegations of Par. 55-59 above).

137.  From at least the Notice Date, Defendants should have known of Plaintiff's patents as so identified, understood the allegations of direct and indirect infringement against them, involving their acts and those of their users, known that their and their users' acts constitute infringement and specifically intended that the users infringe said patents.  Defendants should have been aware at least from such time that there was an objectively high likelihood that their actions thereafter constituted, and were inducing and contributing to patent infringement.  Defendants have no good faith basis to believe that their continuing conduct as alleged herein does not constitute patent infringement.

138.  Defendants' continued infringement since at least the Notice Date has been and continues to be willful and deliberate, entitling Plaintiff to increased damages under 35 U.S.C. § 284.

139.  Notwithstanding the filing of the Complaint and of the First Amended Complaint, service of process on Defendant Coolvision, receipt of the Demand Letter, and now the filing and service of this Second Amended Complaint, each with explicit notice of the patents-in-suit, and the manner in which Defendants are alleged to be infringing those patents, Defendants have continued their infringement.  Defendants have continued to infringe without moderation, without compensation to Plaintiff, and on information and belief without any legal justification, thereby demonstrating their indifference to legal obligations and the property rights of others, and their reckless disregard for Plaintiff's patents, and/or their intentional infringement thereof.

140.  Defendants' continued infringement since at least the Notice Date, without a good faith basis to believe that such conduct is not infringing, renders this an extraordinary case under 35 U.S.C. § 285, which entitles Plaintiff to an award of reasonable attorneys' fees.

141.  Plaintiff's operations are not in the adult entertainment field and Plaintiff and Defendants are not currently competitors.  As a consequence, Plaintiff is not in a position to seek preliminary injunctive relief at this time, and thus lacks an adequate remedy by way of a preliminary injunction to prevent ongoing infringement, including willful infringement, by the Defendants.  Accordingly, Plaintiff is entitled to seek enhanced damages for continuing willful infringement

even if Defendants had no knowledge of Plaintiffs' patents prior to the filing of the Complaint.  Not imposing liability for willful infringement for the Defendants' continued infringing conduct would allow Defendants to continue their willful infringement with impunity, at no additional cost, and would be unjust.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands trial by jury on all issues.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff WAG ACQUISITION, L.L.C. requests an entry of judgment in its favor and against Defendants as follows:

a) Declaring that each of the Defendants has and/or continues to directly infringe, induce, and contribute to infringement of one of more claims of United States Patent Nos. 8,122,141, 8,327,011, 8,185,611, and 8,364,839;

b) Declaring that each of Defendants' infringement has been willful, and awarding enhanced damages at least from the Notice Date, jointly and severally against the Defendants;

c) Awarding to Plaintiff the past and continuing damages arising out of Defendants' direct infringement of United States Patent Nos. 8,122,141, 8,327,011, 8,185,611, and 8,364,839 and damages at least from the Notice Date, for Defendants' indirect infringement as alleged herein, jointly and severally against the Defendants;

d) Awarding attorneys' fees, costs, or other damages pursuant to 35 U.S.C. §§ 284 or 285 or as otherwise permitted by law, jointly and severally against the Defendants;

e) Upon the final judgment of infringement herein, entering an order, pursuant to 35 U.S.C. § 283, permanently enjoining and restraining Defendants and their respective officers, directors, principals, agents, servants, employees, successors and assigns, and all those in active concert or participation with each of the foregoing from infringing, inducing, and/or contributing to the infringement of any claims of United States Patent Nos. 8,122,141, 8,327,011, 8,185,611, and 8,364,839;

f) Awarding costs in this action to Plaintiff; and

g) For such other and further relief as the Court may deem just and proper.

Dated:   September 2, 2014

RONALD ABRAMSON
DAVID G. LISTON
LEWIS BAACH PLLC
The Chrysler Building
405 Lexington Avenue
New York, NY 10174

By: s/ Ronald Abramson
      Ronald Abramson
Tel: (212) 822-0163

By: s/ David G. Liston
      David G. Liston
Tel: (212) 822-0160

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

On this 2nd day of September, 2014, I certify that I caused a copy of the foregoing Second Amended Complaint to be served upon counsel for Defendant Coolvision Ltd. via the Court's ECF filing system and upon Defendants Sobonito Investments Ltd. and I.M.L. SLU via first-class mail, postage prepaid.

Dated: September 2, 2014

<u>s/ Ronald Abramson</u>
Ronald Abramson